### BURKE et al. v. HORTH (COLUMBINE OIL CO. et al., Interveners).

(District Court, D. Wyoming. February 25, 1924.)

No. 1162.

1. **Mines and minerals** ⊜⇒56—**Lease held not to create vested interest.**

A lease for 50 years, the consideration for which was $1 nominal consideration and the development of the land to productivity for oil and gas and one-eighth of all the oil and gas produced, *held* not such an instrument creating a vested interest as should be construed as grant in lands generally.

2. **Mines and minerals** ⊜⇒81—**Abandonment may be proved as defense to claim of prior lessee.**

Abandonment of an oil and gas lease may be legally asserted and proved by a subsequent lessee as a defense to a claim of the prior lessee, especially if the prior lease may not have created a vested interest.

3. **Mines and minerals** ⊜⇒5—**Evidence in suit to impose trust on lease from government held to show abandonment of oil and gas lease.**

Evidence in a suit to impress a trust on a lease from the government *held* sufficient to show an abandonment of an oil and gas lease made to plaintiff's assignor by the owner of placer claims.

4. **Mines and minerals** ⊜⇒5—**Issuance of lease, held not adjudication of rights of claimants.**

The issuance of an oil and gas lease by the Department of the Interior to the owner of placer mining claims on the application of such owner and the holders of a lease from him *held* not an adjudication of the rights of such lessees as against earlier lessee's, especially in view of the "inuring" clause of Leasing Act, Act Feb. 25, 1920 (Comp. St. Ann. Supp. 1923, § 4640¼ et seq.).

In Equity. Suit by M. B. Burke and the Eclipse Oil Company, against Robert Taylor, who died after the trial of the cause had started, but before it was completed, and whose executor, Ralph R. Horth, was substituted as defendant, in which suit the Columbine Oil Company and another were intervening defendants. Decree for defendants.

See, also, 293 Fed. 408.

John R. Smith, of Denver, Colo., N. E. Corthell, of Laramie, Wyo., H. H. Schwartz, of Casper, Wyo., and George E. Brimmer, of Rawlins, Wyo., for plaintiffs.

A. C. Campbell, of Cheyenne, Wyo., Merle N. Poe, of Findlay, Ohio, A. M. Gee, of Casper, Wyo., and Roderick N. Matson, of Cheyenne, Wyo., for defendants.

KENNEDY, District Judge. This is a suit in equity through which the plaintiffs seek to impress a trust in their favor upon a certain lease issued by the United States to one Robert Taylor, under the Leasing Act of February 25, 1920 (Comp. St. Ann. Supp. 1923, § 4640¼ et seq.); the land covered by the lease being the east half of section 12, township 39 north, range 79 west, in Natrona county, state of Wyoming, and within the Salt Creek oil field. After the trial of the cause had started, and before its completion, the principal defendant, Robert Taylor, died, and his executor, the defendant Ralph R. Horth was substituted, and the suit revived in his name. The circumstances out of which the controversy arose appear to be substantially as follows:

Prior to the year 1911 the former defendant, Robert Taylor, became the owner of certain oil placer mining claims initiated under the Placer Mining Act, and on the 21st of November, 1911, Taylor entered into a lease with one J. Condit Smith, which lease had for its general purposes the exploitation of lands therein named, including the lands in controversy, for the purpose of developing and recovering the oil and gas therein contained. The particular provisions of this instrument, so far as they are material to the controversy here, will be noticed later. This lease by various assignments came into the hands of the plaintiffs, Burke and the Eclipse Oil Company. On September 23, 1916, a second lease upon the property here involved was executed by Taylor to one Mosher, through whom by transfers the defendants Ohio Oil Company and Columbine Oil Company acquired interests in the property. After the passage of the Leasing Act, Taylor, with the other two defendants, made application for a lease upon the premises to the Interior Department, to the granting of which the plaintiffs filed protest, and after a hearing the lease was awarded to Taylor alone, some time in December, 1920, and is the lease upon which the plaintiffs here seek to impress a trust in their favor by virtue of the Smith lease. A more particular discussion of the respective claims of the parties under the Smith and Mosher leases will follow elsewhere.

The cause has been ably argued and briefed by counsel, and presents interesting and intricate legal questions, upon which the courts have spoken through a mass of decisions not all in harmony, and particularly differing in facts and circumstances, making it difficult for this court, within its limitations, to select a consistent course in disposing of the matters presented. The principal legal question presented is as to the character of the instrument of the lease to Smith, in regard to which it is claimed by plaintiffs that the lease constitutes a grant of the lands covered, thereby creating a vested interest in the plaintiffs, which cannot be disturbed, except through recognized legal processes not heretofore invoked. The defendants maintain that the instrument

carries nothing more than the provisions of an ordinary oil and gas lease, and must be treated along the same lines as the courts have treated such instruments.

[1] An examination of the lease appears to "grant, devise, lease, and let" the property in question to Smith, "to have and to hold" the same for a period of 50 years; that the lessee shall perform all the requirements of law in regard to assessment work, and make proper filings of the necessary affidavits, and report upon the same to the lessor; that the lessee shall drill as many wells as he may see fit, and may sublet the whole or any parts of the premises, and that one-eighth of all oil or gas found in and saved from the lands shall be delivered to the lessor; that the lessor shall not dispose of or incumber the lands during the term of the lease, without giving the lessee the first privilege to purchase, and that the lessee will commence to drill a well upon the premises before the 15th day of June, 1912, and continue drilling the same with due diligence until completed, and commence a well within 60 days of the completion of each well until each 160 acres of the devised premises has been drilled. It is further provided that, when oil or gas has been discovered in paying quantities, the lessors shall immediately proceed to make application for patent for the quarter section upon which such discovery has been made. The final provision of the lease is that the lessor may in any year before the 1st of October reassign his lease to the lessor, in the event the lands do not justify further prospecting for oil or gas, and that he shall thereby be relieved from any further assessment work upon the lands.

The Circuit Court of Appeals of this circuit has quite recently spoken in regard to instruments somewhat similar to the one in controversy, these decisions being strongly urged upon this court by counsel for plaintiffs. The first case is that of Smith v. McCullough (C. C. A.) 285 Fed. 698, which was a suit in equity, in which it was held that the lease there gave the lessee a present vested interest in the land. In that case, however, one of the controlling features seemed to be that the lease provided, in the event the lessee did not drill or explore for oil within the time and in the manner fixed under the terms of the lease, that he could be relieved therefrom by paying a stipulated price per acre, designated as rental, during the life of the lease, and in the opinion in that case the court found that this rental had been paid. The other case, decided more recently by the same court, is Ewert v. Robinson (C. C. A.) 289 Fed. 740, which was a suit in ejectment, and therefore found its place upon the law, rather than upon the equity, side of the court, in which particular it is distinguishable from the case at bar; but it likewise appears in the case that there was also a provision exempting the lessee from the commencement of drilling operations by the payment of a prescribed amount per acre as rental, which was apparently a principal, if not a controlling, factor in the decision rendered in the case.

In the case at bar, the lease has no such provision. Outside of the $1 nominal consideration, the entire consideration for the granting of the lease seems to have been the performance of the assessment work by the lessee and the development of the land to productivity for oil and

gas. Under such a lease as we have here under consideration, if reasonable diligence be not exercised by the lessee in the development of the land for the production of oil and gas, the lessor is left without any consideration for his leased premises, and for an unusually long period of years. In the cases cited, the lessor had entered into a stipulation that, in the event the land were not developed for oil and gas within the stipulated period, a rental might be paid in lieu thereof, which, however small, signifies the will of the parties at the time the contract was made, and that it would be either the development of the property within a specified time or the payment of rental, which would relieve them from the designated development. In the case at bar, the lease shows upon its face that the development of the land for oil and gas, so as to bring the proceeds to the lessor, is virtually the sole consideration for the granting of the lease. If this requirement on the part of the lessee is not fulfilled, the consideration fails, and it would be clearly against equity to require the lessor to be bound by a contract of a nature so grossly inequitable. In the opinion of this court, the lease in this case is not such an instrument creating a vested interest as that it should be construed as following the strict terms of instruments applying to grants in lands generally.

[2] In the case of Smith v. McCullough, supra, it further appears that the question of abandonment was one of the determining factors in that decision. This strongly suggests the inference, which in the present situation may be accepted as a principle of law to be invoked, that, even in the case of a lease creating a vested interest in the lessee, the doctrine of abandonment may be legally asserted and proved in the ordinary manner as a defense to the claim of a prior lessee. Much stronger would be the ground for recognizing it as a defense, if the instrument in a controversy in equity may not have created a vested interest. Abandonment has been invoked by the defendants as one of the principal defenses in the case at bar, and leads to a discussion of that phase of the case at this time.

[3] After the original Smith lease was executed, and prior to the time that drilling operations were required to commence, the Eclipse Oil Company, assignor of Smith, erected a rig upon the northeast quarter of section 12 and started drilling operations. The evidence is sharply in conflict as to what the concrete result of these operations were, the testimony varying from practically a showing of no oil to a production in excess of 25 barrels per day. Unfortunately no log of the well, which is ordinarily kept, was produced in evidence. Demand was made upon plaintiffs for the production of the log, as the evidence indicated that one had been kept; but none was produced. The burden of the testimony seems to indicate that there might have been a showing of oil at a depth of about 800 feet, which the field superintendent of the Eclipse Oil Company testified as not being sufficient to measure, and which one of the drillers employed by that company described as a "showing of oil," but not sufficient to color the tools. Apparently no effort was made to preserve the oil, if there were any, at the 800-foot depth; but the well was continued to the first wall creek sand, in excess of 1,500 feet, where water was encountered. Subsequent to this, the rig was dismantled, the casing pulled, and all paraphernalia

removed from the premises. No further development of the tract was made under the Smith lease, and the testimony discloses that the Eclipse Company afterwards became financially embarrassed, as its creditors, through attachment suits and judgments, forced a sale of what property it had in the state of Wyoming.

The officers of the Eclipse Company, of which Burke, one of the plaintiffs, was vice president, appeared to take no further interest in the affairs of the company, so far as its oil operations in the Salt Creek field were concerned. One of the excuses offered for this is that the lands were within the withdrawn area, under the proclamations of the President in 1909 or 1910, and that litigation was threatened by the government if drilling were started under these circumstances, and that the matter of securing the passage of the Leasing Act was paramount in the minds of the officers of the Eclipse Company, which legislation was expected to afford relief to certain classes of claims. The testimony discloses that in 1916, as before stated, a second lease upon the premises was granted by Taylor to one Mosher, who subsequently assigned his lease to the Columbine Company, which in combination with the Ohio Oil Company entered upon the land in controversy and drilled two wells to unquestioned discovery and production of oil in paying quantities. Upon this showing, produced before the Department of the Interior, the lease to Taylor was granted.

The question is: Is the evidence in this case sufficient to show an abandonment under the Smith lease? This court feels that it must be so held. Recognizing that perhaps the question of intention in abandonment is a necessary element, yet such intention need not necessarily be proven by statements of a party, although there is some evidence of statements to this effect. The facts and circumstances from which the inference would naturally flow are often sufficient and as convincing as the spoken words of a party. This court is convinced that there would scarcely be sufficient proof to hold a discovery of oil in this well by the Eclipse Company in such form and quantity as would justify a reasonable man in promoting it further, much less a production in paying quantities, such as the lease seems to require. Neither is it consistent with the bringing in of an oil well that the rig should immediately be dismantled and the casing pulled, which in itself indicates the strongest suggestion of intentional abandonment.

Another strong reason suggesting that oil was not produced in any substantial quantities is that the undisputed evidence shows that during the drilling operations it was necessary to secure oil for operating the machinery at all times from neighboring wells. If oil were produced in this well in any consequential quantities, there ought certainly to have been a sufficient amount to supply the drilling operations on a single well, especially if it were conserved and stored in pools and sumps, as claimed by plaintiffs.

In dealing with a lease of this character, it must be borne in mind that oil and gas are different from other minerals, in that they do not remain in place, but are only available when captured and removed. Oil under one parcel of land, if not removed, would soon be extracted through operations upon adjoining lands, and therefore those seeking benefits from oil operations must proceed with all due diligence, or

their opportunity is lost, and all their work and expense held for naught. It was said in regard to the necessary development required upon oil and gas properties, in the case of Allegheny Oil Co. v. Snyder, 106 Fed. 764, at page 768, 45 C. C. A. 604, at page 608:

"This contract, in view of its peculiar purpose and object in the development of oil and gas in the territory, has written into it an implied covenant on the part of the lessee that he will drill and operate such number of oil wells on the lands as would be ordinarily required for the production of oil contained in such lands, and afford ordinary protection to the lines."

Whatever may have been the justification in the minds of the lessees under the Smith lease to cease operations on account of threatened litigation and the uncertainty in the outcome of pending litigation, it could scarcely justify the entire withdrawal from the state of every officer and every employé of the company, and permitting the property to be disposed of, without suggesting the conclusion that all of this constituted an abandonment of operations under the lease. It would seem at least that one representative could have been placed in charge of the property, but instead of this we find it urged on the part of the defendants, as a defense to the plea of estoppel made by the defendants, that plaintiffs knew nothing of the nature of operations under the Mosher lease until a year or more afterward. Such evidence appeals to the court as more convincing proof of an abandonment of the property than as a logical plea in protection against the invoked doctrine of estoppel in a case like this.

The court is not to blame on account of the financial embarrassment or poor financial situation of the plaintiffs during the long period of time that the property remained dormant in the matter of their operations. Equity must rest upon a more substantial basis than financial inequalities. Experience has demonstrated that the development of oil fields in an effective and lucrative manner requires considerable capital, but because this is true it does not justify the relaxation of the ordinary accepted methods of development to accommodate those who are less fortunately situated financially.

After the year 1913, Taylor performed his own assessment work upon the property. The plaintiffs, in explanation of this, assert that Taylor had entered into an agreement with them by which all work might be suspended on account of the uncertain situation of lands of this character at that time. While there is oral evidence which, although indirect, tends to disprove this claim of plaintiff, yet the strongest evidence in the mind of the court is its unreasonableness under the circumstances. Is it reasonable to suppose that Taylor would have relieved the plaintiffs from this assessment work without consideration of any kind, and then at his own expense have performed it, in the meantime, having his property tied up for a period of years, with nothing coming to him as a consideration, or without anything being done under the lease for the development of the property? The situation disclosed in this respect seems so patent that its very analysis suggests the answer. In view of these circumstances, the court finds it unnecessary to rule affirmatively upon the point raised by defendants, other than Taylor or his executor, that in order to constitute a waiver of the conditions of the lease in regard to assessment work as

against innocent parties, which the defendant oil companies undoubtedly were, that such a waiver should have carried a valuable consideration, and should have been executed and placed upon the records the same as was the original lease, in order to have a binding effect upon them.

The plaintiffs as assignees and owners of the Mosher lease, had notice through the records of the Smith lease, and the examination of the property itself disclosed the development or absence of it under that lease. This was all that was required of them, and was sufficient in the opinion of this court to justify the conclusion that the Smith lease had been abandoned, so far as to impute to them good faith in their undertaking. If this premise is true, then their subsequent action in entering upon and operating the property under a subsequent lease was a bona fide transaction, in which they are entitled to protection.

The defendants also raise the defenses of laches and estoppel, which under the circumstances in this case are so closely interrelated with the defense and question of abandonment that the three defenses are practically treated as one. This court does not feel inclined to take up and discuss the questions of laches and estoppel, not being satisfied that they are controlling elements in the matter of fixing the legal status of any rights which the plaintiffs may have to the lands in controversy. The defense of abandonment appears to this court to have been so clearly established that it will be adopted as the basis of the defendants' claim, rather than the other two defenses mentioned.

[4] This court cannot accept the theory of the defendants, however, that the proceeding before the Department of the Interior was an adjudication of the rights of the respective lessees of Taylor in and to the property. The department adopted the policy of issuing leases only to the owners of claims, and in following this rule issued the lease to Taylor, who was the title owner. I am of the opinion that this case illustrates very fairly the purposes of the so-called "inuring" clause of the Leasing Act, leaving matters under such circumstances to the determination of the courts, and it therefore becomes the function of this court in this case to determine the relative rights of the lessees who claim under the owner to whom the lease was granted. There is, however, a strong equity in this case featuring in favor of defendants, in that through their efforts and the expenditure of considerable sums of money in actually discovering and producing oil, it was possible to secure the lease, as distinguished from the efforts of the plaintiffs, which produced nothing upon which the rights to a lease might be recognized in behalf of the owner.

For the reasons stated, the court must find in favor of the defendants and against the plaintiffs, and a decree will be entered accordingly, with costs to defendants, reserving to both parties their proper exceptions upon those points which have been considered and passed upon adversely to them by the court.